

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00319-CR

———————————————

RODNEY ADAM HURDSMAN, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR17817

Before Sudderth, C.J.; Meier and Gabriel, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

### I.  Introduction

Appellant Rodney Adam Hurdsman appeals his conviction of theft of more than $20,000 but less than $100,000 of property, for which he was sentenced to 75 years' confinement.  *See* Act of May 29, 2011, 82nd Leg., R.S., ch. 1234, § 21, 2011 Tex. Sess. Law Serv. 3309, 3310 (amended 2015, 2017) (current version at Tex. Penal Code Ann. § 31.03(e)(5) (West Supp. 2018)).  In a single issue, Hurdsman argues that his Sixth Amendment right to a speedy trial was violated, complaining that the State made no attempt for three-and-a-half years to return him to Wise County for trial. We affirm.

### II.  Background

In February 2014, after various items were stolen from the Enbridge Energy Partners gas-processing plant, Hurdsman was arrested and released on bond.  In June 2014, he was indicted.

The indictment alleged that Hurdsman had unlawfully appropriated catalysts, tools, and equipment.  One of the witnesses described the catalysts used by the facility as large, round objects "made out of different kinds of precious metals," including platinum and titanium, which "take[] raw exhaust and . . . burn[] the raw exhaust so . . . emissions come out clean," similar to the way that a catalytic converter functions in an automobile.  The indictment alleged that Hurdsman stole five catalysts, in

2

addition to various tools and equipment. The catalysts ranged in value from $1,500 to $8,245 each.

According to Hurdsman, after he was arrested on September 29, 2014, he was "continuously incarcerated, and held on the arrest warrants and charges *in this case*, as a pre-trial inmate." [Emphasis added.] But this contention is undermined by the motion to withdraw filed by his retained counsel, Jim Shaw, just days after Hurdsman's arrest. In that motion, Shaw represented to the court that Hurdsman had been taken into federal custody.[1] The trial court allowed Shaw to withdraw on October 7, 2014.

Shaw died in December 2016. *See* Mitch Mitchell, *Fort Worth lawyer Jim Shaw fought cancer as hard as he fought for his clients*, Fort Worth Star-Telegram (Dec. 28, 2016, 9:48 PM), https://www.star-telegram.com/news/local/obituaries/article123467179.html (last visited Oct. 30, 2018).

Approximately six months after Shaw's death, Hurdsman filed a declaration of inability to hire counsel, and the trial court appointed counsel for him. A month later, Hurdsman invoked his right to self-representation when the trial court refused to

---

[1]Shaw attached to his motion an article dated September 30, 2014, which stated that Hurdsman and his wife had been arrested in Louisiana in connection with a June 2014 bank robbery in Arkansas. During one of his hearings, Hurdsman admitted that he was arrested in Shreveport on September 29, 2014. According to Hurdsman, he was detained for 30 days in Louisiana before being taken to Benton, Arkansas, where he spent five months. Hurdsman stated that the Arkansas charges were dropped, but then he was charged and confined in Williamson County for 28 months before the Williamson County charges were dismissed.

substitute Hurdsman's preferred attorney as his appointed counsel.[2] The State filed a notice of enhancement five days later, seeking to enhance the offense's punishment range from the third-degree felony punishment range (two to ten years' confinement and up to a $10,000 fine, *see* Tex. Penal Code Ann. § 12.34 (West 2011)), to that of a habitual felon under penal code section 12.42(d), based on three theft-related convictions from Tarrant County in 1997 and a 2002 federal conviction for bank robbery. *See id.* § 12.42(d) (West Supp. 2018) (providing for an enhanced punishment range of 25 to 99 years' confinement based on prior felony convictions).

On August 17, 2017, the trial court held a hearing and granted Hurdsman's pro se motion to approve funds for an investigator. During the hearing, Hurdsman claimed that he had "kind of invoked [his] right to having a speedy trial" in 2014 prior to plea negotiations and before the "main investigator here caused [him] to be arrested in Shreveport, Louisiana." Hurdsman stated that after that, Arkansas "g[o]t [him]," and then "Williamson County[, Texas] . . . put a charge on [him]." The trial judge told Hurdsman that he would have a standby counsel and that Hurdsman could ask the standby counsel to take over at any time. The trial court also heard Hurdsman's pro se motion to dismiss and denied it. During the hearing, Hurdsman

---

[2]Hurdsman had prior experience representing himself. *See Hurdsman v. Mayo*, No. 02-17-00099-CV, 2018 WL 3060116, at *1 n.2 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op.) (listing several of Hurdsman's pro se civil cases brought in federal court).

expressed his desire for more time to complete discovery and have his investigator investigate the facts.

Within two weeks, Hurdsman again requested appointed counsel.[3] The trial court held a hearing on August 29, 2017, and appointed counsel for him. On the record, the trial judge expressed his belief that Hurdsman's request for counsel was "only an attempt to manipulate and delay the trial"; Hurdsman assured the trial judge that he was not trying to delay the trial. During the August 29 hearing, Hurdsman's newly appointed counsel, who had previously been Hurdsman's standby counsel, informed the trial court that Hurdsman had asked that counsel request a motion for continuance "on the suppression issue." The trial court denied the request.

On September 7, 2017, Hurdsman's appointed counsel filed a supplemental motion to dismiss, renewing Hurdsman's speedy trial complaint and attaching Hurdsman's handwritten affidavit in which Hurdsman alleged that he had requested a speedy trial since his arrest. The motion was heard on September 11.

---

[3]In his new request for appointment of counsel, Hurdsman referred to an "incident" in the courtroom involving his previous appointed counsel. The incident was referenced at the August 29, 2017 hearing and at the pretrial hearing on September 11, 2017. At the August 29 hearing, the trial court stated that Hurdsman had alleged that his previous appointed counsel had assaulted him in the courtroom in front of 40 or 50 people on August 3. Hurdsman agreed that he had made this allegation and claimed that three of his family members in the courtroom had seen it.

At the September 11 pretrial hearing, when the trial court recollected that Hurdsman had accused his previous appointed counsel of assaulting him, Hurdsman interjected, "Your Honor, I -- there was no assault." The trial judge replied, "Well, I know there wasn't an assault . . . because I was here in the courtroom [when it would have allegedly happened]."

At the hearing Hurdsman's affidavit was not offered into evidence, but the prosecutor pointed out to the trial court that while Hurdsman had been continually in custody since September 2014, Hurdsman had been held "not on these charges but on charges that arose from crimes that were committed in Benton, Arkansas, and Round Rock, Texas." The prosecutor further argued that prior to July 2017, Hurdsman had not asserted any right to a speedy trial and pointed out that at a previous hearing, Hurdsman had requested a continuance.[4] The trial court denied Hurdsman's motion, and his trial began the next day.

A jury found Hurdsman guilty, found the State's enhancement and habitual allegations true, and assessed his punishment at seventy-five years' confinement. The trial court sentenced him accordingly.

### III. Speedy Trial

In reviewing the trial court's ruling on an appellant's speedy trial claim, we apply a bifurcated standard of review: an abuse of discretion standard for the factual components, and a de novo standard for the legal components. *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002); *Murphy v. State*, 280 S.W.3d 445, 452 (Tex. App.—Fort Worth 2009, pet. ref'd).

---

[4]At the August 17, 2017 hearing, the prosecutor stated that Hurdsman had asked for a continuance "in open court" that morning, and the trial judge stated, "Yeah, I know he did. I mean, he didn't ask for it, but I got the idea that he wanted one." Later during the hearing, Hurdsman expressed his desire for additional time for discovery.

In determining whether an accused has been denied his Sixth Amendment right to a speedy trial, we must use a balancing test in which the conduct of both the prosecution and the defendant are weighed. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972)). The factors to be weighed include, but are not limited to

- the length of the delay,

- the State's reason for the delay,

- the defendant's assertion of his speedy trial right, and

- the prejudice to the defendant resulting from the delay.

*Id.* (citing *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192). Yet no single factor is necessary or sufficient to establish a violation of the right to a speedy trial. *Id.* (citing *Barker*, 407 U.S. at 533, 92 S. Ct. at 2193); *see Hopper v. State*, 520 S.W.3d 915, 923–24 (Tex. Crim. App. 2017) (observing that the "speedy-trial right is amorphous, slippery, and necessarily relative" (quoting *Vermont v. Brillon*, 556 U.S. 81, 89, 129 S. Ct. 1283, 1290 (2009))).

## A. Factors

The *Barker* balancing test also imposes dual burdens. The State has the burden of justifying the length of delay, while the defendant has the burden of proving the assertion of the right and showing prejudice. *See Barker*, 407 U.S. at 531, 92 S. Ct. at 2192. The defendant's burden of proof varies inversely with the State's degree of

culpability for the delay. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* at 280–81.

Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a purely legal question. *Id.* at 282; *see also Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013) (observing that at least two of the *Barker* factors—the reason for the delay and the prejudice to the accused—are fact-specific inquiries), *cert. denied*, 571 U.S. 1141 (2014). Courts are directed to apply the balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. *Cantu*, 253 S.W.3d at 281. We must also be mindful that the constitutional right is that of a speedy trial, not dismissal of the charges. *Id.*

### 1. Length of the Delay

The length of the delay is measured from the time that the defendant is arrested or formally accused, and a speedy trial claim will not be heard until the passage of a period of time that is, on its face, unreasonable under the circumstances. *Dragoo*, 96 S.W.3d at 313–14. In general, the delay must approach a year to be unreasonable enough to trigger the inquiry. *Id.* at 314; *see also Hopper*, 520 S.W.3d at 924 (explaining that the length of delay is a double-inquiry: whether the delay is

sufficiently long to trigger further analysis and to what extent it stretches beyond the triggering length).

Hurdsman was arrested in February 2014 and was indicted for the offense in June 2014. His trial began on September 12, 2017, over three years later. Therefore, this factor weighs in favor of finding a violation of his speedy trial right. *Dragoo*, 96 S.W.3d at 314 (noting that the delay must stretch beyond the bare minimum needed to trigger judicial examination of the claim).

## 2. Reason for the Delay

When considering the reason for the delay, different weights should be assigned to different reasons because some reasons are valid and serve to justify appropriate delay. *Id.* While in the absence of an assigned reason for the delay a court may not presume either a deliberate attempt on the State's part to prejudice the defense or a valid reason for the delay, the court nevertheless must determine whether the State or the defendant is more to blame for the delay. *Id.*; *see Hopper*, 520 S.W.3d at 924. The State's deliberate delay to hamper the defense or to gain a tactical advantage in the defendant's case is weighed heavily against the State, while more neutral reasons, such as negligence or overcrowded courts, weigh against the State, but less heavily. *Hopper*, 520 S.W.3d at 924. Delay caused by the defense weighs against the defendant. *Id.*

The prosecution of a defendant on other charges may be a valid reason for a delay in bringing him to trial, but the State must offer argument and proof to sustain

its burden on this factor. *McIntosh v. State*, 307 S.W.3d 360, 367 (Tex. App.—San Antonio 2009, pets. ref'd) (mem. op.) (citing *Dragoo*, 96 S.W.3d at 314 n.4; *Easley v. State*, 564 S.W.2d 742, 745 (Tex. Crim. App. [Panel Op.] 1978)).[5] Similarly, upon the demand of a federal prisoner facing state charges, "Texas ha[s] a constitutional duty to make a diligent, good-faith effort to bring him before the [state] court for trial." *Smith v. Hooey*, 393 U.S. 374, 381–83, 89 S. Ct. 575, 578–79 (1969) (observing that upon the prisoner's motion for a speedy trial, the State could have issued a writ of habeas corpus ad prosequendum for the federal bureau of prisons to make him available for prosecution). *But cf. Hopper*, 520 S.W.3d at 926–27 (holding that *Smith* was not on point when appellant made no demand for a speedy trial in his Texas case while he was incarcerated out-of-state, particularly when *Smith* preceded the Interstate Agreement on Detainers (IAD)).

Hurdsman alleges that the State deliberately delayed his prosecution, arguing that "the evidence and history of events strongly suggests that the State voluntarily elected to forestall prosecution in the instant matter pending resolution of other charges pending against [him]." Hurdsman also asserted in his handwritten affidavit attached to his attorney's supplemental motion to dismiss that he had repeatedly requested a speedy trial since his arrest and complained that he was "continuously incarcerated" after his September 29, 2014 arrest. But his affidavit was not offered

---

[5]In *McIntosh*, the court noted that the State offered no proof regarding a pending felony charge and "did not attempt to explain how a pending case that was dismissed justified any delay." 307 S.W.3d at 367–68.

into evidence at the hearing, and the record shows that he did not raise his speedy trial complaint until almost three years later, when his pro se motion to dismiss and his supplemental motion to dismiss were filed. *Cf. Smith*, 393 U.S. at 381–83, 89 S. Ct. at 578–79. At the hearing, Hurdsman offered no testimony to contradict the record or the State's assertion that he did not raise his speedy trial request until 2017.

Beyond Hurdsman's speculation that the State delayed bringing him to trial so that it could use the other pending charges against him, nothing on this record indicates that the State acted in bad faith.[6] On the other hand, the State offered no

---

[6]In his affidavit, Hurdsman asserted that the prosecutor had "stepped aside and allowed another jurisdiction in the State of Texas to try and prosecute criminal offenses against [him] that . . . were brought by indictment on May 19, 2015, almost a full year after the indictment in this case." He complained that only after those cases were dismissed did the "Wise County District Attorney seek to hurry and bring [him] to trial on this case at this very late date."

Hurdsman provided nothing to show that the other cases had been dismissed and provided no other details to support his allegations of bad faith. He offered no evidence at the hearing to support this complaint or his assertion that he had initially been offered a plea deal of 18 months' confinement in state jail in 2014 and that the State's new plea offer was 40 years' confinement, other than the following dialogue during the hearing between his counsel and the trial judge:

> [Defense counsel]: And I'll also point out that prior to his being picked up there was an 18-month offer, and he was prejudiced in that respect that he obviously is now facing 25 to life had this proceeded --

> THE COURT: I presume he refused every offer that they made him because nothing has happened.

> [Defense counsel]: Well, actually, your Honor, my understanding -- I'll represent to the Court I think he had intended to accept the offer, but then he picked up the additional charge --

11

argument or proof at the hearing on Hurdsman's motion to sustain its burden of showing a valid reason for the delay. Although Hurdsman was confined in federal prison instead of another state's prison, both parties had the equal ability to act to bring the case to a speedier resolution and accordingly are equally at fault. *See Hopper*, 520 S.W.3d at 918, 926–27 (holding that "because the defendant and the State had an equal ability to bring the case to a speedy resolution by invoking the IAD, both parties are equally at fault under the reasons-for-delay factor," which consequently did not weigh against either party). *But cf. McCain v. State*, No. 02-17-00210-CR, 2018 WL 3059964, at *10 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op., not designated for publication) ("McCain also relies on his lengthy pretrial confinement as evidence of prejudice. But as the State argues, the record shows that in October 2016, McCain was sentenced to five years' confinement in another case, indicating that he would have remained confined in any event.").

### 3. Defendant's Assertion of His Right

Although a defendant's failure to assert his speedy trial right does not amount to a waiver of that right, failure to assert the right makes it difficult for him to prove that he was denied a speedy trial because his lack of a timely demand indicates

THE COURT: Yeah, I know.

[Defense counsel]: -- and his attorney didn't do it.

THE COURT: Those kinds of things usually make a difference.

12

strongly that he did not really want a speedy trial and was accordingly not prejudiced by the lack of one. *Dragoo*, 96 S.W.3d at 314. And the longer the delay, the more a defendant's inaction weighs against him. *Id.*; *see Balderas v. State*, 517 S.W.3d 756, 771 (Tex. Crim. App. 2016) (observing that from 2009 to 2013, defense counsel consistently sought additional time for investigation and negotiation and did not assert the right to a speedy trial until after a jury had been selected in 2014), *cert. denied*, 137 S. Ct. 1207 (2017). Likewise, filing for a dismissal instead of a speedy trial generally weakens a speedy trial claim because it shows a desire to have no trial rather than a speedy one. *See Murphy*, 280 S.W.3d at 454. Thus, if a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure. *See id.*

Hurdsman elected to file a motion to dismiss rather than a motion for a speedy trial, and he did so without stating a reason—cogent or otherwise—for the choice he made. *See id.* Further, as acknowledged by the trial court at the September 2017 hearing on his motion, Hurdsman requested a continuance—or at least had requested more time—less than a month before his trial date. Accordingly, this factor weighs against finding a violation of Hurdsman's speedy trial right.

### 4. Prejudice to Defendant Resulting from the Delay

We must assess this factor in light of the interests that the speedy trial right was designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of the accused's anxiety and concern; and (3) limitation of the

13

possibility that the accused's defense will be impaired. *Dragoo*, 96 S.W.3d at 315. The last item is the most serious because a defendant's inability to adequately prepare his case skews the fairness of the entire system. *Id.* But because excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove—or for that matter, identify—affirmative proof of particularized prejudice is not essential to every speedy trial claim. *Id.* However, this "presumption of prejudice" diminishes when the defendant acquiesces in the delay. *Id.*

Hurdsman argues that the delay (1) deprived him of his choice of counsel because his counsel died during the case's pendency, (2) caused his pretrial incarceration to exceed the State's initial plea-bargain offer, (3) allowed one of his co-defendants, James Capers, to relocate "to somewhere in Arkansas" and thus become "no longer available to be interviewed and testify," (4) prevented him from locating one of the State's investigators, and (5) allowed the State to lose crime scene photographs taken of the stolen property.[7]

First, the record reflects that Shaw, Hurdsman's retained counsel, withdrew on October 7, 2014, after Hurdsman was taken into federal custody in Louisiana on an unrelated bank robbery charge. Accordingly, Shaw's unfortunate death over two years

---

[7]Hurdsman argues on appeal that the delay caused him severe anxiety, caused him to miss the birth of his son, caused him to be denied treatment for mental health issues—schizophrenia, depression, and anti-social disorder—during his 35 months of incarceration, and deprived him of the ability to financially support his family while incarcerated. But these assertions are found only in Hurdsman's affidavit, which was attached to his supplemental motion but not offered into evidence at the hearing.

14

later, in December 2016, could not have deprived Hurdsman of his choice of counsel, particularly when Hurdsman did not seek any appointment of counsel for two years after Shaw's withdrawal and for several months after Shaw's death.

And while Hurdsman complains that during the delay, Capers "relocated to somewhere in Arkansas," rendering Capers unavailable for interview and testimony, the record during the punishment phase of trial reveals that Capers was actually "relocated" to a federal penitentiary for bank robbery. Furthermore, Hurdsman fails to explain why Capers's absence from the state would have prevented Capers from testifying—telephonically or otherwise—in the instant trial, or what Capers's testimony would have been.

With regard to his allegation of prejudice caused by the inability to locate John Pettit, a state investigator, Hurdsman did not specify at the speedy trial hearing what Pettit's testimony would have been. Nor did he recite or describe any due diligence used in attempting to locate Pettit. *See Phipps v. State*, 630 S.W.2d 942, 947 (Tex. Crim. App. [Panel Op.] 1982) (stating that before the contention that undue delay made defendant unable to locate witnesses will amount to "some showing of prejudice," defendant must "show that the witnesses were unavailable, that their testimony might be material and relevant to his case, and that he has exercised due diligence in his attempt to find them and produce them for trial"); *Harrison v. State*, 282 S.W.3d 718, 722 (Tex. App.—Amarillo 2009, no pet.) ("To establish particularized prejudice based on an unavailable witness, a defendant must present proof both of the efforts made to

15

locate the witness and that the witness would have benefitted his defense."). *But cf. Puckett v. State*, 279 S.W.3d 434, 441 (Tex. App.—Texarkana 2009, no pet.) (holding that appellant showed prejudice associated with the delay when he "provided testimony about the loss of witnesses who could apparently, from their contemporaneous reports to the police, have provided testimony substantially at odds with the State's theory of the assault").

As to Hurdsman's argument that evidence was lost as a result of the delay, Hurdsman fails to demonstrate that the loss of the photographs he complains of actually hindered, rather than aided, the defense. At trial, Hurdsman's counsel used the lack of photographic evidence to raise the issue of value by questioning whether the stolen catalysts had been new or refurbished.

Wise County deputies had photographed the property that was recovered before returning the property to Enbridge, but the photographs were no longer available because a computer virus had infected the Sheriff's office computers, affecting multiple cases. Accordingly, the State was forced to rely on witness testimony and related documents to prove the value of the stolen property.[8]

It was undisputed that on February 24, 2014, Enbridge employee Darrell Jacobson reported the theft and gave former Wise County Sheriff's Deputy Christopher Hodges, the responding patrol officer, a list of the items that were

---

[8]Hurdsman was charged with committing theft of property worth $20,000 to under $100,000.

missing and his approximations of their value. Sergeant James Mayo, an investigator in the Wise County Sheriff's Office Criminal Investigations Division and the primary investigator on the Enbridge theft, testified that he made no effort to ascertain the stolen items' value beyond what Jacobson had told him.

Jacobson testified that the station did not maintain a written inventory, that he had made the list from memory rather than consulting Enbridge's invoices for the items, and that to the best of his knowledge, all of the catalysts that had been listed as stolen had been new. But Jacobson also testified that after 2014, Enbridge had started buying refurbished catalysts[9]—catalysts that had been washed out—if they were still good, although he could not say whether a refurbished catalyst would be less expensive than a new one. But he did testify that refurbished catalysts were not returned in boxes, and that all of the catalysts that had been returned to Enbridge after the theft had been in boxes, signifying to him that they were new rather than refurbished.

Shane Stoff, an area service manager for the company formerly known as Exterran—Hurdsman's employer at the time of the theft—testified that some refurbishing companies returned washed catalysts in boxes. He also expressed the

---

[9]On the other hand, Randall Buckner, Enbridge's systems supervisor and Jacobson's supervisor, said that the practice of refurbishing catalysts did not start until 2015 or 2016, and to his knowledge, the practice had not started at the time of the offense in February 2014.

opinion that a washed catalyst could hold the same value as a new catalyst, depending on the precious metals it contained.

Jacobson also testified that, in hindsight, some of the catalyst sizes he had listed in the information that he gave to the Sheriff's office had been incorrect and the value numbers for some of them had not been entirely correct because he had been listing them from memory and not on the basis of written records. And he agreed that three-and-half years after the fact, he could not provide a more accurate list and that the prices he had given were estimates for replacement value and not the catalysts' fair market value or what they would have been worth after refurbishment. Buckner, who approved the invoices for ordering catalysts, corrected some of the values in the Jacobson list during his testimony.

The trial court admitted the Jacobson list into evidence over Hurdsman's objection. The trial court also admitted into evidence the inventory list of property that was returned to Enbridge by the Sheriff's office.

While it may be fairly argued that the delay in trying Hurdsman allowed a computer virus to destroy photographs of the stolen property, it is not so apparent that the loss of the photographs hindered Hurdsman's defense. It could be equally argued that the situation worked to Hurdsman's advantage. Because of the computer virus and corresponding absence of photographs of the stolen property, his counsel was able to more vigorously cross-examine the State's witnesses about the property's value and, during closing arguments, to highlight the deficiencies in their

18

testimonies,[10] impugn the efficacy of the theft investigation, and argue for a verdict on the lesser-included offense of theft of property worth $1,500 to under $20,000.[11] To the extent that Hurdsman suffered any prejudice from the loss of the photographic evidence, however, this factor weighs slightly in his favor. *See Dragoo*, 96 S.W.3d at 315.

As to Hurdsman's observation that loss of the photographic evidence led to his plea offer being increased from eighteen months' confinement to forty years' confinement,[12] the record does not support indulgence in such speculation. Outside of Hurdsman's handwritten affidavit, which was not admitted into evidence, the record provides no insight into the circumstances surrounding the State's plea offers. And because the record reflects other convictions that preceded this 2014 theft by at least a decade, it is equally plausible that the alleged increase in the State's plea offer

---

[10]During closing argument, Hurdsman's counsel argued that while there were voluminous exhibits, "what we don't have, obviously, is one good picture of any one of those catalysts that was taken," criticized the police work as "a little bit sloppy," argued that the witnesses testifying about the catalysts' value over three years before was "their best guess" rather than proof, and lambasted Sergeant Mayo for not backing up the digital photos.

[11]Hurdsman does not challenge the values given for the non-catalyst stolen property, which totaled $9,977, nor does he challenge the sufficiency of the evidence to support his conviction.

[12]In his brief, Hurdsman complains, "When the State had the pictures it offered eighteen (18) months[;] when the pictures were no longer available the offer rose to thirty (30), then forty (40) years."

could have been based on Hurdsman's criminal record rather than the absence of photographs of the stolen evidence.

Finally, because the evidence at trial conclusively showed that Hurdsman had committed the theft, Hurdsman's claim that his defense was impaired by the delay becomes further attenuated. *See id.* Surveillance camera photos of the theft that showed Hurdsman perpetrate the offense at the Enbridge facility were admitted into evidence and published to the jury, and Hurdsman's confession, given a few days after his arrest in February 2014, was also admitted into evidence and published to the jury. In the 13-minute recording, Hurdsman attempted to cut a deal by seeking to work off his anticipated sentence by flipping on other thieves in the area, admitted that everything found on the trailer attached to his truck had been stolen, and explained that he had forgotten that there were cameras at the Enbridge facility.

## B. Analysis

The weight of the four factors, when balanced together, is against finding a violation of the right to a speedy trial. While the delay may have been excessive, Hurdsman could have urged the State to bring him to trial sooner, but his focus was on dismissal, not a speedy trial. Moreover, the record and his reply brief in this court demonstrate his acquiescence in the delay by reflecting that he did not assert his right to a speedy trial until his transfer to Wise County in 2017—three years after he was indicted. And the record does not reflect such prejudice from the delay that his defense was impaired. We overrule Hurdsman's sole issue.

## IV. Conclusion

Having overruled Hurdsman's sole issue, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 8, 2018